IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WAYNE OSBORG,

    Petitioner,                   No. CIV S 06-2190 FCD KJM P

    vs.

ROBERT HEIDELBACH, Sheriff,

    Respondent.                FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is proceeding with counsel on this petition for a writ of habeas corpus, challenging his San Joaquin County convictions for the offense of maintaining a substandard building in violation of California's State Housing Act, Health & Safety Code § 17910 et seq., on the ground that there was insufficient evidence to show that he received notice and a reasonable time to mitigate the conditions, which, he contends, is an element of the offense.

I. Factual And Procedural Background

        In an amended complaint, petitioner was charged with twenty-nine misdemeanor counts of violations of the state Housing Act. CT 155-173.[1] During trial, counts one through

---

[1] Petitioner has submitted a Clerk's Transcript in red covers with the documents divided by tabs. The documents are consecutively paginated with two numbering sequences, one Bates stamped, the other hand written. This court cites to the Bates stamped numbers in referring to these documents.

1

1  twenty, twenty-two and twenty-six were dismissed on motions of the court.  CT 152-153, 175.

2          The charges of conviction were based on conditions at 430 East Oak Street in
3  Stockton, a twelve unit apartment building that petitioner owns.  I RT 58, 90.  On February 28,
4  2001, Stockton police officer Gregory Spears visited the property as part of the City's community
5  policing patrol.  II RT 78.  He noticed an overflowing, improperly placed dumpster, garbage
6  stacked along the walls and standing water on the sidewalk.  II RT 79.  He sent a report to code
7  enforcement.  II RT 81.  On March 9, 2001, the Stockton Housing and Redevelopment
8  Department sent a letter to petitioner, notifying him that a dumpster was blocking the sidewalk
9  and that garbage, junk and debris was piled around the dumpster, and advising him to remove the
10 debris.  People's Ex. 11 (Lodged Document 11).

11         Steven Zerweck is a code enforcement officer for the city of Stockton.  II RT 29.
12 On March 26, 2001, he inspected unit 6 at 430 East Oak.  II RT 30.  Among the things he noted
13 was an infestation of insects.  II RT 30-33.  He issued a citation to the tenants of unit 6, directing
14 them to "take appropriate measures to eliminate the insect (roaches) infestation in the unit."
15 People's Ex. 12 (Lodged Document 12) & Def't's Ex. 104 (Lodged Document 18).  A copy of
16 this citation was sent to petitioner.  Id.

17         On August 26, 2001, Zerweck issued a citation to the tenants of unit 6, telling
18 them again to take care of the cockroaches and to remove garbage and debris from the unit.  II
19 RT 54-55.  The problem had improved during Zerweck's later visits, but Zerweck suspected that
20 the entire portion of the building where unit 6 was located was infested.  II RT 56.

21         Peter Lemos is a code enforcement officer for the city of Stockton.  I RT 55.  He
22 became aware of problems at 430 East Oak Street in June 2002, when he received a complaint
23 about a dumpster in the driveway and garbage and debris around the property.  I RT 59-60.
24 While he was at the site on June 11, he noticed garbage under the stairways and on the ground
25 around the property.  I RT 59.  Thereafter, he issued an administrative citation to petitioner,
26 advising him of improper placement of the dumpster and the accumulated junk and debris and

giving him until June 17 to ameliorate the conditions. I RT 60-61, 65; II RT 3, 10. The citation was posted at the property and a copy was mailed to petitioner, both regular and certified mail. I RT 62, 64; Def't's Ex. 102 (Lodged Document 14).

Lemos returned on June 21, 2002, found the conditions still existing, and issued a $200 citation because of the accumulation of garbage and debris. I RT 67, 89; II RT 3, 7. This citation advised petitioner to maintain clean and sanitary conditions on the property and established a reinspection date of July 7, 2002. II RT 3, 11; Def't's Ex. 102 (Lodged Document 14).

Lemos made additional visits to the property on July 10, 12 and 15 and took pictures of the continued violations. II RT 11. On July 18, he conducted another inspection and issued a citation with a compliance date of July 24, imposed a $500 fine and again advised petitioner to remove the garbage, junk and debris. I RT 67; II RT 3, 11; Def't's Ex. 102 (Lodged Document 14). On these occasions, he posted the property and mailed the citations. I RT 67.

On July 25, Lemos received a separate telephone complaint about the interior of some the units and so he returned to the property that day, this time with a police officer along. I RT 68; II RT 11. He entered a unit and found sewage and cockroaches. I RT 68. When he was in the building, he looked into the basement and saw water and garbage in the basement. II RT 20. Lemos left a message for petitioner, outlining his concerns. I RT 69; II RT 11.

On July 29, 2002, Lemos received a written complaint about the property. II RT 11. He took photos on July 31. II RT 11. On August 8, he returned for a more complete inspection. I RT 71. He knocked on doors and asked to inspect the units. II RT 11. It did not appear to Lemos that any effort had been made to remedy the conditions he had noted earlier. I RT 71-72. He took another series of pictures on August 16. II RT 12.

/////
/////
/////

1    On August 14, 2002, petitioner filed a document with the city, acknowledging
2 receipt of the citation dated July 18, but disagreeing with the inspection. II RT 5; Def't's Ex. 103
3 (Lodged Doc. 15).
4    Dr. Corky Hull, a medical doctor with an additional degree in public health, is a
5 health officer for the City of Stockton, working as a consultant on questions of health issues
6 relating to housing. I RT 4-5. In that capacity, he inspected 430 East Oak in Stockton on
7 Thursday, August 15, 2002, in the company of code enforcement officer Lemos. I RT 9, 48.
8    There was a large, overflowing trash container at the front of the building and the
9 building itself was dilapidated. I RT 10. Dr. Hull inspected several of the units and found the
10 tenants cooperative. I RT 16. In all the units he visited, Dr. Hull found infestations of
11 cockroaches, hundreds if not thousands of them. I RT 26-27. He noticed discoloration in the
12 walls, suggesting that the cockroaches had been bringing decaying material into the area for some
13 time; this in turn suggested a chronic infestation of cockroaches. I RT 27. Dr. Hull found mouse
14 droppings and saw a large rat running behind a refrigerator. Id. He saw a pool of water, an
15 extensive amount of garbage and a decomposing dead cat in the basement, all of which produced
16 a noxious odor. I RT 18, 51.
17    A video shot on August 6 by a tenant showed the conditions Dr. Hull had
18 observed on the 15th: the basement was piled with refuse and the dead animal was visible. I RT
19 35-36. Cockroaches were "pretty much everywhere" and the long-standing nature of the
20 infestation was evident. I RT 41, 44. The "chronic debris" was apparent. I RT 38. An open
21 vent allowed rodents into the building. 1 RT 47.
22    Lemos posted the property on August 16, a Friday. I RT 74. He also mailed the
23 notices, both regular and certified mail, and dropped a copy of the notice at the office of
24 petitioner's attorney. I RT 92. Later that evening Lemos spoke to petitioner, who acknowledged
25 that he was aware his property had been posted. I RT 70. Lemos told petitioner that if he did not
26 /////

1 take immediate action to correct the health and sanitation issues by that Monday, August 19,
2 Lemos would have to move the tenants out.  I RT 70; II RT 6.

3       The notice itself listed eleven items to be corrected by the 19th.  III RT 5.
4 Among the conditions was "contract with a licensed pest control company and obtain regular
5 services, as necessary, to alleviate the severe infestation of insects, vermin, and rodents . . . .";
6 "locate all sources of water, gray water, and sewage leaks, and make all necessary repairs to
7 eliminate . . . unsanitary conditions. . . "; and "eliminate dirt, refuse, and filth from all floor areas
8 and stairwells."  III RT 13-14; Def't's Ex. 106 (Lodged Doc. 16 (conditions 1, 2 and 3)).  Lemos
9 believed that the corrections could be made in the time given if petitioner took a work crew to the
10 premises.  III RT 10.

11       Lemos and Hull returned to the property on August 19, but did not see significant
12 evidence that any of the problems had been addressed.  I RT 32, 74.  Before vacating the
13 building, Lemos issued three citations, all of which were mailed to petitioner and posted on the
14 property.  II RT 13.  Each copy of a citation was posted over the mailboxes, on weather-resistant
15 8½ by 11" paper.  II RT 19.  All of the citations were based on violations of garbage regulations.
16 II RT 16.

17       The building was not cleared for reoccupancy until August 2003.  II RT 7-9.
18       Petitioner testified in his own defense.  One provision of his rental agreement
19 obligated the tenants to keep their units clean.  II RT 86.  A lot of the garbage around the
20 property came from next door.  II RT 104.  In addition, transients often rooted in the dumpster for
21 bottles and left a mess.  II RT 105.

22       Petitioner found a line from a toilet tank that was leaking into the basement, so he
23 repaired that; it was just water, not sewage, that had leaked.  II RT 89.

24       Petitioner determined not to do anything about the cockroaches until Monday,
25 August 19, when he hired a company to deal with them; no company was available on the
26 weekend.  II RT 89.  He had done some work earlier and noticed cockroach problems, but it was

5

not bad. II RT 93. In July 2002, he sprayed and put out roach traps. II RT 117.

The jury was unable to reach a verdict on count twenty-one and acquitted on counts twenty-three, twenty-five and twenty-nine. CT 178, 186-188. Petitioner was convicted of counts twenty-four, twenty-seven, and twenty-eight. CT 178, 183-185. Count twenty-four alleged that petitioner maintained a substandard building in violation of California Health and Safety Code § 17920.3(a) on or about August 19, 2002 as the result of an infestation of insects, vermin or rodents. CT 169. Count twenty-seven charged petitioner with maintaining a substandard building in violation of California Health and Safety Code § 17920.3(j) on or about August 12, 2002 as the result of an accumulation of weeds, vegetation, junk, dead organic matter, debris, garbage, offal, rodent harborages or stagnant water. CT 171. Finally, count twenty-eight alleged that petitioner maintained a substandard building in violation of California Health and Safety Code § 17920.3 (j) on August 15, 2002 as the result of an accumulation of weeds, vegetation, junk, dead organic matter, debris, garbage, offal, rodent harborages or stagnant water. CT 171-172.

Petitioner was placed on formal probation; one of the conditions of probation for count twenty-four was that he serve ninety days in county jail. CT 294.

Petitioner appealed his convictions to the Appellate Department of San Joaquin County Superior Court and thereafter filed a petition for a writ of habeas corpus in the California Supreme Court.

The Appellate Department of the San Joaquin County Superior Court denied the petition in the following order:

> Appellant WAYNE OSBORG appeals from his conviction for three counts of violation of Health and Safety Code § 17920.3. Appellant alleges that the trial court erred in various particulars.
>
> The matter was briefed, argued and submitted.
>
> Upon review and consideration of the arguments of counsel and the record on appeal, the Court finds that there was no error committed by the trial court.

> Appellant's primary contention on appeal was that he was entitled to reasonable notice and an opportunity to correct the problems before he could be made to face criminal charges. The court finds that it is not necessary to reach this question because, whether or not notice and an opportunity to correct the violations is a pre-requisite to a conviction, the jury was so instructed.
>
> The jury was instructed that:
>
> 'In order to be found guilty of this misdemeanor, the People must prove the following elements:
>
> '1. That the defendant owned the property in question on the date in question;
>
> '2. That the property was used for residential purposes;
>
> '3. That the property developed such a condition to an extent that endangered the life, limb, health, property, safety, or welfare of the public or the occupants.
>
> '4. That the defendant was given reasonable notice by the City of the above conditions, and had a reasonable opportunity to remedy the violation.' . . . .
>
> 'Jurors are presumed to follow a court's admonitions and instructions.' It therefore follows that the jury found that appellant was given 'reasonable notice . . . of the . . . conditions, and had a reasonable opportunity to remedy the violation.'

Lodged Doc. 3 (Appellate Department Decision, dated February 1, 2006 (internal citations omitted)). The California Supreme Court denied review in a single-line order. Lodged Doc. 5.[2]

II. <u>Standards Under The AEDPA</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Federal habeas corpus relief also is not available for any

/////

/////

---

[2] The Supreme Court cited to <u>In re Waltreus</u>, 62 Cal.2d 218, 225 (1965) and <u>In re Lindley</u>, 29 Cal.2d 709, 723 (1947). Respondent has not urged, however, that the issue raised in this petition is subject to any procedural default, so any such claim is waived. <u>Morrison v. Mahoney</u>, 399 F.3d 1042, 1046-47 (9th Cir. 2005).

claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[3]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

/////

/////

/////

---

[3] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

This court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

III.  Analysis

In <u>Jackson v. Virginia</u>, the Supreme Court examined the role of a habeas court in considering a challenge to the sufficiency of the evidence:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. 307, 319 (1979) (emphasis in original).

The Court continued:

> [A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

<u>Id</u>. at 326.  Constitutionally sufficient evidence need not rule out every hypothesis except that of guilt.  <u>Id.</u>  This court must apply the <u>Jackson</u> standard with "explicit reference to the substantive elements of the criminal offense as defined by state law."  <u>Id</u>. at 324 & n.16.  Moreover, this court must apply <u>Jackson</u> with an extra layer of deference to the state court's determination, as mandated by the AEDPA.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-75 (9th Cir. 2005), <u>cert. denied</u>, __ U.S. __, 126 S.Ct. 1142 (2006).

The first question raised by the instant petition is whether reasonable notice is an element of the Health and Safety Code violations with which petitioner was charged.  In an order filed March 30, 2007, denying petitioner's request for a stay of his sentence, this court made a preliminary determination that notice was not an element.  On further research and reflection, as reviewed below, the court concludes that this determination may have been incorrect.  Nevertheless, the court finds that if notice is an element, then there was sufficient evidence that petitioner received such notice.

/////

/////

A. <u>Notice And The Statutory Scheme</u>

Petitioner challenges the sufficiency of the evidence underlying his convictions for violations of California's State Housing Act, Health & Safety Code Section 17910 <u>et seq</u>. Specifically, he argues that he was not given notices of the deficiencies in the property on two occasions and on a third occasion was not given a reasonable time to make the repairs listed in the notice. He argues that reasonable notice to remedy any violations is a condition precedent to prosecution under California Health & Safety Code Section 17995.[4] That section declares that "any person who violates any of the provisions of this part" is guilty of a misdemeanor.

As both sides have conceded, there is no law on the question of notice as a condition precedent for a prosecution under these provisions of the Health and Safety laws. Petitioner's argument is based on provisions of Sections 17980.6 and 17980.7. Section 17980.7 provides in part that "[i]f the owner fails to comply within a reasonable time with the terms of the order or notice issued pursuant to Section 17980.6 . . . [] the enforcement agency may seek and the court may order imposition of the penalties provided for under Chapter 6 (commencing with Section 17995)." Section 17980.6, in turn, provides in part that "[i]f a building is maintained in a manner that violates any provisions of this part, . . . the enforcement agency may issue an order or notice to repair or abate pursuant to this part. . . ." The use of the term "may" suggests that the notice requirement is not mandatory, but rather is one means of enforcement available for violations of California's housing laws. <u>Cf.</u> <u>Fox v. County of Fresno</u>, 170 Cal.App.3d 1238, 1244 (1985).

In addition, section 17920.3 lists the conditions that render a building substandard and provides in part that any building in which the conditions exist "shall be deemed and hereby is declared to be a substandard building. . . ." There is no suggestion in this statute that any notice or opportunity to repair is required before a building is considered substandard. Coupled

---

[4] Further unattributed statutory references are to the California Health and Safety Code.

11

with section 17995, which declares that any person who violates any of the provisions of that part is guilty of a misdemeanor, there is a colorable argument that a prosecution for a violation of section 17920.3 need not be preceded by notice and a reasonable opportunity to repair.

Alternately, maintaining a substandard building is akin to maintaining other types of nuisance, activities that "injure or interfere with the community's exercise and enjoyment of rights common to the public." People ex rel. Gallo v. Acuna, 14 Cal.4th 1090, 1109 (1997); Cal. Penal Code § 370 (a public nuisance is "anything which is injurious to health . . . or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property"). It is appropriate, then, to consider nuisance law in interpreting the provisions of the Health and Safety Code. United States v. Ressam, 474 F.3d 597, 602 (9th Cir. 2007) (in general similar statutes are to be interpreted in similar manner).

Under California Civil Code § 3491, there are three remedies against a public nuisance: Indictment or information, abatement or a civil action. The California Penal Code provides in part:

> Every person who maintains, permits, or allows a public nuisance to exist upon his or her property or premises . . . after reasonable notice in writing from a health officer . . . . to remove, discontinue or abate the same has been served upon such person, is guilty of a misdemeanor . . . .

Cal. Penal Code § 373a. Cases interpreting this section have recognized that notice with an opportunity to ameliorate the violation is a condition precedent to prosecution. People v. Cooper, 64 Cal.App.2d Supp. 946, 949 (1944); see also People v. Jones, 205 Cal.App.3d Supp. 1, 4 (1988) (prosecution for violation of Cal. Penal Code § 372; court notes that defendant was warned before charges were filed); compare People v. Pozzi, 91 Cal.App. 150, 157 (1928) (no notice necessary when prosecution was under the Volstead Act rather than California nuisance statutes). In this case, then, it is reasonable to conclude that, as with the similar nuisance statutes, notice and an opportunity to abate is a condition precedent to prosecution for violations of California's Housing Act.

B. <u>Sufficiency Of The Evidence Of Notice</u>

    1. <u>Count Twenty-Four</u>

This count alleged that the building was substandard because of an infestation of insects, vermin and rodents on August 19, 2002. On August 16, 2002, Lemos presented petitioner with a written notice that the building would be vacated by August 19 if petitioner had not taken steps to eliminate the infestation of insects, vermin and rodents, along with other alleged problems. I RT 74; III RT 5; Def't's Ex. 106 (Lodged Doc. 16). In addition, on July 25, 2002, Lemos had visited the property and noted cockroaches, among other things, in one of the units he inspected; Lemos left a message for petitioner, informing him of what he had seen. I RT 69; II RT 13. Moreover, in March 2001, Zerweck had issued a notice to the tenants of unit 6, advising them to eliminate the infestation of cockroaches he had observed; a copy of this notice was mailed to petitioner. Def't's Ex. 104 (Lodged Document 18).

When Dr. Hull inspected 430 East Oak Street on August 15, he found hundreds, if not thousands of cockroaches and discoloration in the walls, suggesting that the insects had been carrying decaying matter into the building for some time.

A rational trier of fact could have concluded that petitioner had received written notice of the insect infestation as early as March 2001 when he received the copy of the notice provided to the tenants of unit 6, but had taken no steps to eliminate the problem, which apparently spread to other units, causing the "chronic infestation" Dr. Hull noticed. This would be more than reasonable notice upon which to base a prosecution.

Even if the jury found that the triggering notice was that presented to petitioner on August 16, 2002, the court cannot say that a reasonable juror would be unable to determine that the notice was reasonable. The notice called for petitioner to begin the process of eradication by entering into a contract with a pest control service. Although petitioner testified that pest control services were not available on the weekend, he did not outline any steps he had taken to determine if, in fact, a company was available, even if on an emergency basis. The jury was not

obligated to take petitioner's unsupported claim at face value in determining whether the August 16 notice provided him with a reasonable opportunity to begin to eradicate the chronic infestation of cockroaches and rodents at the property.

  2. <u>Counts Twenty-Seven And Twenty-Eight</u>

These counts were based on the accumulation of junk, debris and garbage on August 12 and 15, 2002. Lemos issued three notices to petitioner, directing him to remove garbage, junk and debris; the first was issued on June 11 and gave him until June 17, 2002, to ameliorate the conditions; the second was issued on June 21, with a reinspection date of July 7, 2002; the third was issued July 18 with a compliance date of July 24, 2002. I RT 60-61, 65; I RT 67, 88-89; II RT 3-4, 7; Def't's Ex. 102 (Lodged Document 14).

When Lemos returned on August 8 and 16, it did not appear to him that any effort had been made to remedy the conditions he had noted earlier. I RT 71-72; II RT 11-12. In addition, when Lemos and Dr. Hull inspected the property again on August 15, both observed an overflowing dumpster and an accumulation of trash in the basement. I RT 10, 90.

A rational jury could find that petitioner had been given three notices to clean up the garbage and debris on the premises -- the first approximately two months before the dates alleged in the information -- yet had done nothing to remedy the conditions: each time Lemos visited, he found conditions essentially unchanged. <u>See</u> I RT 71-73. There was sufficient evidence of reasonable notice and opportunity to comply to support the jury's verdict.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a Doc. should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 13, 2007.

_____
U.S. MAGISTRATE JUDGE

2/osbo2190.157